350 F.3d 1061
 Lynda STEGALL, Plaintiff-Appellant,
v.
CITADEL BROADCASTING COMPANY; Citadel Communications Corporation; Marathon Media LP, Defendants-Appellees.
 No. 02-35399.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 2, 2003. — Seattle, Washington.
 Decided December 2, 2003.
 As Amended January 6, 2004.
 
 Laura B. Allen, Seattle, Washington, for the plaintiff-appellant.
 Courtney W. Wiswall (argued) and Paul Buchanan (briefed), Portland, Oregon, for the defendants-appellee.
 Appeal from the United States District Court for the Eastern District of Washington; Edward F. Shea, District Judge, Presiding. D.C. No. CV-00-05064-EFS.
 Before: DONALD P. LAY,* WARREN J. FERGUSON, and RONALD M. GOULD, Circuit Judges.
 OPINION
 FERGUSON, Circuit Judge.
 
 
 1
 The issue in this case is: what showing of pretext must a plaintiff in a retaliation suit make in order to overcome a defendant's motion for summary judgment, where the defendant has alleged legitimate reasons for the plaintiff's termination. Appellant Lynda Stegall ("Stegall") appeals the District Court for the Eastern District of Washington ("District Court")'s grant of summary judgment in favor of defendant Marathon Media, L.P. ("Marathon"), which foreclosed a jury trial on Stegall's retaliation claim under Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination ("WLAD"). The District Court held that, although Stegall established a prima facie claim of retaliatory discharge against Marathon, she was unable to demonstrate that Marathon's nondiscriminatory reasons for terminating her were a pretext for retaliation. Stegall alleges that she was fired from KORD, a country music radio station, in retaliation for making complaints about gender discrimination and wage disparities between male and female employees at KORD. Because Stegall raises a triable claim with respect to her retaliation claim, we reverse the District Court's grant of summary judgment in favor of Marathon.
 
 I BACKGROUND
 A. Facts
 
 2
 Lynda Stegall was employed by Citadel Broadcasting Company ("Citadel") as an on-air personality at KORD, a country music station that played recent country music hits,[1] since 1993. Beginning in 1997 or 1998, Stegall began to make complaints to her managers at Citadel that her male on-air personality co-host was sexually propositioning her and using sexually suggestive language on and off the air. She also complained that she was being paid less than her male counterparts and requested a raise. Allegedly, Citadel management did not adequately address her complaints.
 
 
 3
 Stegall's problems with KORD escalated in October 1998 when Stegall took time off from work because she fell ill from the stress and anxiety she was experiencing as a result of KORD's gender discrimination, and because her managers were being unresponsive to her grievances. When she returned to work, Stegall averred that Curt Cartier ("Cartier") who, at the time, was employed as the program director for another one of Citadel's radio stations, exhibited a great deal of hostility toward her. Stegall stated in her deposition that prior to her two week leave of absence, she and Cartier had been friends. Stegall had previously spoken with Cartier, as well as other station employees, on various occasions, about her complaints of gender discrimination at KORD. However, Stegall noted that upon her return, Cartier refused to speak with her. Stegall believed that Cartier was upset because she had walked out of KORD to protest the unequal treatment that she was receiving, and because she was given a raise in salary as a result.
 
 
 4
 In addition, Cartier allegedly told other station employees that he was angry at Stegall for getting what she wanted and had only been able to do so because she was a woman. On two occasions after coming back to work, Stegall alleges that Cartier yelled at her and denigrated her based on her gender, calling her names such as "slut," "bitch," and "whore," in the course of arguments that were seemingly about unrelated station matters.
 
 
 5
 On November 9, 1999, Marathon Broadcasting ("Marathon") purchased five Pasco, Washington radio stations from Citadel, including KORD. After taking over KORD, Marathon initially retained most KORD employees, a decision that was necessary to ensure continual, uninterrupted broadcasting.[2] Upon Marathon's purchase of Citadel's stations, Eric Van Winkle ("Van Winkle") became the new general manager ("GM"), responsible for supervising KORD and the four other stations that Marathon acquired from Citadel. Prior to assuming the GM position with Marathon, Van Winkle worked in the central sales department for the five Pasco, Washington radio stations when they were owned by Citadel. Shortly after Van Winkle's promotion, he hired Paul Drake and Curt Cartier to serve as co-program directors of KORD under Marathon. Drake and Cartier previously held positions as program directors for other radio stations in the Pasco cluster. As program directors, Drake and Cartier were responsible for the content and presentation of KORD.
 
 
 6
 Due to the change in management and the impending station changes that it was bound to bring, Stegall inquired with Marathon about the security of her employment at KORD on several occasions before she was terminated. Shortly after Van Winkle became manager and Drake became co-program director, Stegall stopped by their individual offices to ask whether her job was secure. Both responded affirmatively.
 
 
 7
 In early December 1999, Stegall and Drake, now her direct supervisor at KORD, had a "get to know you" meeting during which Stegall relayed to Drake the complaints of gender discrimination that she had made to Citadel's managers in the past, and the problems she had been having with Citadel up until Marathon's purchase of KORD. Stegall stated in her deposition that she brought Drake up to speed about her prior concerns, and expressed a desire to see Marathon conduct things differently and remedy the gender inequities. Stegall noted that Drake did not speak much during this meeting and, as a result, she felt very uncomfortable.
 
 
 8
 Nine days after Stegall complained to Drake, on December 15, 1999, Marathon fired Stegall and one other female employee, Kristin Crume. Stegall was told during a meeting with Van Winkle, Drake and Cartier that they were planning changes for KORD which did not include her and, as a result, she was being terminated. At this time, Stegall inquired if anything she had done brought on the decision to fire her, and she was explicitly told that it had not. Rather, the decision, she was told, was solely about the future of KORD.
 
 
 9
 Similarly, when Stegall later applied for unemployment benefits, Marathon informed the state Employment Security Department that a business decision based on changing the programing and formatting was responsible for Stegall's termination, and that nothing she had done caused the discharge. However, after the commencement of this litigation, Van Winkle and Drake stated in their depositions that Stegall was fired in part because they were not satisfied with her overall attitude during the brief period of time[3] she was employed by Marathon.
 
 
 10
 After Stegall's termination, Marathon began making changes to KORD. KORD was switched from station-selected music to a computerized music service; Marathon brought in Leah Knight, a syndicated host from Seattle; changed each of the shows and did on-air promotions about the format changes; stressed a different "brand" of country music;[4] removed all of the daily on-air personalities; and replaced seven announcers on five shifts including every morning show host. The only former daily on-air personality who remained at KORD after the broad station change was Ed Dailey, who was removed from daily duties and given a four-hour Sunday morning "oldies" show. However, Stegall and one other woman[5] were the only employees who were fired from KORD and not re-assigned to another station within the Pasco cluster.[6]
 
 B. Procedural history
 
 11
 On August 2, 2000, Stegall filed this litigation against Citadel and Marathon, alleging gender discrimination, sexual harassment, and retaliation in violation of both Title VII and WLAD. On December 19, 2001, Stegall stipulated to the dismissal of all claims of sexual harassment and retaliation against Citadel, and stipulated to the dismissal of all claims of sexual harassment against Marathon. The District Court granted summary judgment to Marathon on Stegall's Title VII and WLAD claims of illegal retaliation, finding that Stegall was unable to demonstrate that Marathon's legitimate reasons for terminating her were pretextual. Because Stegall has proffered a substantial amount of specific circumstantial evidence that Marathon's reasons for terminating her were motivated by retaliation, we reverse the District Court's decision.
 
 II STANDARD OF REVIEW
 
 12
 We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 (2000). The District Court granted summary judgment in favor of Marathon, finding that, although Stegall made a prima facie showing of retaliation, she could not rebut the legitimate reasons put forth by Marathon for terminating her. "We review the district court's decision to grant summary judgment de novo." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1219-20 (9th Cir.1998) (citations omitted). Viewing the evidence in the light most favorable to Stegall, we must determine whether any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law. Id. at 1220. In doing so, "[t]he evidence of the [nonmoving] party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in the light most favorable to [her]." Lindahl v. Air France, 930 F.2d 1434, 1437 (9th Cir.1991).
 
 III DISCUSSION
 
 13
 Stegall contends that she was illegally terminated in retaliation for making wage discrimination complaints to Marathon that she believed to be the result of gender discrimination in violation of Title VII and the WLAD. Because Washington courts look to federal law when analyzing retaliation claims, we consider Stegall's Washington state law claim and federal claim together. See Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir.2002); Graves v. Dep't of Game, 76 Wash.App. 705, 887 P.2d 424, 428 (1994).
 
 A. Prima facie case of retaliation
 
 14
 Stegall alleges that Marathon terminated her employment in retaliation for complaining to Marathon of a disparity in pay and bonuses between herself and her male counterparts. Under § 704 of the Civil Rights Act of 1964, it is unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3 (2000). To make out a prima facie case of retaliation under Title VII, Stegall must demonstrate that "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision." Raad v. Fairbanks North Star Borough Sch. Dist., 323 F.3d 1185, 1196-97 (9th Cir.2003). If Stegall is able to assert a prima facie retaliation claim, the "burden shifting" scheme articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir.2002).
 
 
 15
 Under McDonnell Douglas, once Stegall makes out a prima facie case of retaliation, "the burden shifts to [Marathon] to articulate a legitimate, non-discriminatory reason for the adverse employment action." Manatt v. Bank of Am., N.A., 339 F.3d 792, 800 (9th Cir.2003). If Marathon articulates such a reason, Stegall "bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." Id. (internal quotation marks and citation omitted).
 
 B. Pretext
 
 16
 Stegall has two avenues available for showing that Marathon's legitimate explanation for firing her is actually a pretext for retaliation. The first is by "directly persuading the court that a discriminatory reason more likely motivated the employer[,] or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citation omitted).
 
 
 17
 As in all civil cases, Stegall can prosecute her case using either direct or circumstantial evidence tending to prove that Marathon terminated her employment in retaliation for making complaints of gender discrimination. "`Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" Godwin v. Hunt Wesson, Inc., 150 F.3d at 1221 (quoting Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir.1994)). "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." Id. In contrast, when direct evidence is unavailable, the Godwin court noted, and the plaintiff proffers only circumstantial evidence that the employer's motives were different from its stated motives, we require "specific" and "substantial" evidence of pretext to survive summary judgment. Id. at 1222.
 
 
 18
 Although we note that the Supreme Court's recent decision in Desert Palace, Inc. v. Costa, ___ U.S. ___, 123 S.Ct. 2148, 156 L.Ed.2d 84 (U.S.2003), may undermine Godwin to the extent that it implies that direct evidence is more probative than circumstantial evidence, we agree with the Godwin court that Stegall must proffer "specific" and "substantial" evidence of pretext to overcome Marathon's summary judgment motion. See Manatt, 339 F.3d at 801 ("Because Manatt failed to introduce any direct or specific and substantial circumstantial evidence of pretext, summary judgment for the [employer] must be affirmed."); Brown v. City of Tucson, 336 F.3d 1181, 1188 (9th Cir.2003); Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir.1996) ("To avoid summary judgment, Bradley must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses. She must produce specific, substantial evidence of pretext.") (internal quotation marks and citations omitted).
 
 
 19
 Nevertheless, it is important to note that Desert Palace affirmed the value and import of circumstantial evidence in all cases. In the course of affirming a decision of our circuit sitting en banc that, "[i]n order to obtain an instruction under § 2000e-2(m) [of the 1991 Civil Rights Act], a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that `race, color, religion, sex, or national origin was a motivating factor for any employment practice[,]'" 123 S.Ct. at 2155, the Court stressed "the utility of circumstantial evidence in discrimination cases." Id. at 2154. The Court stated that "[t]he reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: `Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" Id. (quoting Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)).
 
 
 20
 Moreover, the Court also recognized the critical role that circumstantial evidence plays even in criminal cases: "The adequacy of circumstantial evidence also extends beyond civil cases; we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required." Id. Finally, the Court noted that "juries are routinely instructed that `the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" Id. (quoting 1A K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed.2000)). Accordingly, we refuse to make such a distinction in Stegall's case.
 
 
 21
 C. "Single motive" versus "mixed motive" cases
 
 
 22
 Further complicating the inquiry in a Title VII case is the varying terminology that courts routinely utilize. As we explained in Costa v. Desert Palace, Inc., 299 F.3d 838 (9th Cir.2002) (en banc), courts often categorize cases as either "mixed motive" or "single motive" (sometimes also termed "pretext" cases). The distinction between the two types of cases is as follows:
 
 
 23
 "In [single-motive] cases, `the issue is whether either illegal or legal motives, but not both, were the `true' motives behind the decision.' In mixed-motive cases, however, there is no one `true' motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate."
 
 
 24
 Id. at 856 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 260, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). The significance of the distinction between "single motive" and "mixed motive" is most often seen towards the end of a trial when the district court must instruct the jury.
 
 
 25
 In mixed motive cases, of which Stegall's case is arguably one, it does not make sense to ask if the employer's stated reason for terminating an employee is a pretext for retaliation, when the employer has offered more than one reason for the action that it took. Rather, the relevant inquiry in a "mixed motive" case is distinct from that of a "single motive" or pretext case. We articulated the proper framework in our en banc opinion Costa v. Desert Palace:
 
 
 26
 [I]n cases in which the evidence could support a finding that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate, the jury should be instructed to determine first whether the discriminatory reason was "a motivating factor" in the challenged action. If the jury's answer to this question is in the affirmative, then the employer has violated Title VII.
 
 
 27
 299 F.3d at 856-57.
 
 
 28
 Similarly, our opinion in Sischo-Nownejad v. Merced Community College District summarizes the test as follows: The analysis in a case involving mixed motives is somewhat different. The Price Waterhouse [v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)] plurality found the [Texas Dep't of Community Affairs v.] Burdine, [450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981),] formula unsuitable for mixed motive cases.... Instead, it adopted a simpler approach. Under Price Waterhouse, the plaintiff must show that it is more likely than not that a protected characteristic "played a motivating part in [the] employment decision." Once that is done, the employer may escape liability only by proving by way of an affirmative defense that the employment decision would have been the same even if the characteristic had played no role.
 
 
 29
 934 F.2d 1104, 1110 (9th Cir.1991) (citations omitted).
 
 
 30
 In the end, the inquiry is straightforward: "[p]ut simply, the plaintiff in any Title VII case may establish a violation through a preponderance of evidence (whether direct or circumstantial) that a protected characteristic played `a motivating factor.'" Costa, 299 F.3d at 853-54. Even at summary judgment, it is important not to lose sight of the ultimate question that will be before the court, should the plaintiff survive summary judgment. See Costa, 299 F.3d at 857 ("The employee's ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was `because of' discrimination [or, in this case, retaliation]."). With these general principles of law in mind, we now turn to the merits of Stegall's retaliation claim. We analyze Stegall's case as both a pretext case and a mixed motives case, and find that her case survives summary judgment under either theory.
 
 D. Stegall's retaliation claim
 
 31
 The District Court found, and Marathon concedes, that Stegall established a prima facie case of retaliation. Therefore, we embark upon our analysis of Stegall's retaliation claim by examining Marathon's stated reasons for terminating her employment. Marathon has offered two reasons to justify its firing of Stegall. At the time it terminated her, Marathon's management stated that it was due to changes that were being made to KORD overall. This was consistent with what Marathon told the state Employment Security Department in response to its inquiry about Stegall's application for benefits. However, after Stegall commenced this lawsuit, Marathon's managers also stated that she was terminated because she had a negative attitude about her job. These are legitimate, nondiscriminatory reasons for Marathon's termination of Stegall. Therefore, under McDonnell Douglas, the burden now shifts to Stegall to put forth evidence that Marathon's reasons are pretextual. Manatt, 339 F.3d at 800.
 
 
 32
 Stegall offers myriad circumstantial evidence to show that Marathon's explanations for her termination are pretextual. Under Burdine, Stegall can show pretext in two ways: either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 256, 101 S.Ct. 1089. Stegall's circumstantial evidence is sufficient to raise a genuine issue of material fact because it demonstrates that an illegitimate reason more likely motivated Marathon, or was at least a motivating factor in her dismissal. Furthermore, Stegall has raised a genuine issue of material fact as to whether Marathon's second reason for firing her, her allegedly negative attitude, is unworthy of credence.
 
 
 33
 While it is true that Stegall must "produce evidence in addition to that which was sufficient for her prima facie case in order to rebut [Marathon]'s showing[,]" Godwin, 150 F.3d at 1220, it is improper to ignore the evidence in support of Stegall's prima facie case. See Lowe, 775 F.2d at 1008. Thus, the District Court erred by examining each piece of Stegall's evidence in isolation, and failing to consider the timing of Stegall's termination in its pretext analysis.
 
 1. The timing of Stegall's termination
 
 34
 Stegall argues that the timing of her termination, which occurred nine days after her discrimination complaints, supports her claim that Marathon's explanations were pretextual. We recently reaffirmed that the timing of adverse employment action can provide strong evidence of retaliation. "Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." Bell v. Clackamas County, 341 F.3d 858, 865 (9th Cir.2003) (finding sufficient evidence to support retaliation claim where low performance reviews immediately followed plaintiff's complaints). Although we have refused to infer causation from timing alone where the gap between plaintiff's protected activity and the adverse employment action extended to 18 months, Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir.2002), we have found timing highly probative even when the period between the employee's complaints and adverse action far exceeded the time interval in Stegall's case. See, e.g., Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987).
 
 
 35
 Here, a mere nine days lapsed between Stegall's complaints of discrimination to her new manager, Paul Drake, and 16933 her termination. Although Marathon disputes that Stegall actually informed Drake of her complaints, Stegall asserts that she did so, and we must view the evidence in the light most favorable to her. See Godwin, 150 F.3d at 1220. In addition, both Marathon and Stegall admit that many station employees were aware of Stegall's complaints, and gender discrimination was one of them. Stegall had made it known throughout the station over the course of her employment with KORD that she resented her lower pay because she believed it was due to her gender. It is clear that Stegall presented credible evidence that she had a discussion with Drake, her new manager, about discriminatory gender pay. Still, setting aside the implausibility of Marathon's contentions that Drake was unaware of Stegall's complaints of gender discrimination, we must resolve issues of credibility in favor of the non-moving party. See Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110, 1132 (9th Cir.2003) ("we `must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence.'") (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)).
 
 
 36
 Marathon attempts to explain the timing of Stegall's termination by noting that it coincided with the other station wide changes. However, in almost the same breath, Marathon asserts that KORD's change phase continued a year and a half after Stegall's termination, when they offered the termination of another employee, Gary Mitchell, to counter Stegall's contention that she and another female employee were the only people terminated from KORD. Marathon cannot have it both ways.
 
 
 37
 The brief period of time that Marathon supervised Stegall before terminating her, merely 24 days, also undermines Marathon's assertion that it terminated her because she had a negative attitude and was not a team player. Although both sides vigorously dispute this issue, it nevertheless casts doubt on Marathon's ability to fairly assess Stegall's performance and attitude accurately, thus strengthening Stegall's contention that illegitimate considerations informed Marathon's decision.
 
 2. Stegall's relationship with Cartier
 
 38
 Although timing, standing alone, may be insufficient to raise a genuine issue with respect to pretext, we do not need to rely solely on timing in this case because there exists substantially more. Of significance is Stegall's evidence of her tumultuous relationship with Cartier and his subsequent role in Stegall's termination. Although Marathon disputes that Cartier was aware of Stegall's prior complaints of gender discrimination to Citadel, the record is otherwise. Stegall alleged and offered deposition testimony that not only did she personally tell Cartier of her complaints of gender discrimination, but also that Cartier markedly changed after Stegall took two weeks off of work to protest the inequities at KORD.
 
 
 39
 Upon her return to work, Cartier's relations with Stegall took a turn for the worse. Stegall asserts that, although they were friends before she took time off, he refused to speak with her at all when she came back to work. Stegall attempted to discuss her walk out with Cartier, but he refused to hear her out. During an argument shortly after her return to work, he denigrated her based on her gender (calling her a "slut," "bitch," and "whore").
 
 
 40
 Furthermore, Marathon admits that during discussions amongst its management, which included Cartier, about the station's re-structuring, Cartier was "adamant" that Stegall be terminated, despite her positive traits.[7] Cartier's insistence that Stegall and Kristin Crume, another employee who also complained of gender discrimination, be fired was attested to by Drake, Cartier's co-program director. Moreover, both Van Winkle and Drake assured Stegall shortly before she was terminated that her job was secure, giving rise to the inference that Cartier's input may have been determinative of Marathon's decision to fire Stegall.
 
 
 41
 Stegall was not alone in her observations of Cartier's animosity towards her. Tamara Peterson, a former KORD employee, testified in her deposition that Cartier told her that he was angered by Stegall's leave of absence and subsequent return to work.[8] According to Peterson, Cartier called Stegall "a spoiled brat" and resented the fact that she had walked out, yet was nonetheless allowed to return to work. Furthermore, Kristin Crume testified in her deposition that Cartier stated, shortly after learning of Marathon's purchase of KORD, that he would not be surprised "when the new company comes in that Lynda [Stegall]'s ass would be blown out of the water." Although not yet a manager at the time he made the comment to Crume, the evidence thus far demonstrates that it is probable Cartier decided to do just that once he became Stegall's manager, because of ill will that he harbored against Stegall due to her complaints. See Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1286 (9th Cir. 2001) (stating that defendant's "exasperation, lack of sympathy, and even animosity towards [the plaintiff]" provided additional support for the jury's verdict in favor of the plaintiff).
 
 
 42
 Add to Cartier's animosity circumstantial evidence that Drake was also not supportive of Stegall's facts of gender discrimination,[9] and there can be no other outcome than to allow this case to go to a jury.
 
 
 43
 3. The station overhaul and Stegall's "negative attitude"
 
 
 44
 Marathon asserts that it fired Stegall due to its overhaul of KORD. However, Marathon distorts and exaggerates the extent of the overhaul. While Marathon asserts that all employees were removed, this is simply not true. Most employees either left of their own accord or were reassigned to another position at KORD, or at another one of the Pasco cluster stations. Only Stegall and Crume were expressly terminated. In short, the only employees terminated by KORD were the two women who had complained of gender discrimination.
 
 
 45
 Moreover, Marathon elaborated on the station overhaul by adding Stegall's negative attitude as a further reason she was terminated. Although Marathon did not offer this reason until after the start of litigation, it has now gone to great lengths to find evidentiary support that Stegall was a problem employee. However, cutting against Marathon are its assurances to Stegall that her job was secure, shortly before her termination. Although Marathon attempts to explain its assurances to Stegall, by arguing that it did so out of necessity to ensure Stegall's radio broadcasts would be free of bias, we reiterate that it is not within our province to delve into these factual disputes; rather, we leave them for the trier of fact. We note, however, that this does not explain why Marathon continued to tell the Employment Security Department that Stegall was not at fault for the termination, even after she was no longer on the airwaves.
 
 
 46
 Finally, although Stegall does not expressly designate her case a "mixed motives" case, both her brief and the record reveal that it can be construed as one. Indeed, a plaintiff need not decide what kind of a case she is bringing at the outset. See Price Waterhouse, 490 U.S. at 247 n. 12, 109 S.Ct. 1775 ("Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a "pretext" case or a "mixed-motives" case from the beginning in the District Court; indeed, we expect that plaintiffs will often allege, in the alternative, that their cases are both.... At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives."). Accordingly, it is common to have an employer's reasons for terminating an employee fleshed out during the course of litigation. See, e.g., Lindahl v. Air France, 930 F.2d 1434 (9th Cir.1991) (Noting that "[s]imply because an explanation comes after the beginning of litigation does not make it inherently incredible[,]" but finding on the facts of the case before it that the employer's differing reasons suggested the later reason was fabricated.).
 
 
 47
 Since it is uncontroverted that Marathon has offered two reasons for firing Stegall, yet we hold that the record in this case would support a finding that Marathon had illegitimate motives, it is logical to examine the case as one involving "mixed motives." See Price Waterhouse, 490 U.S. at 244-45, 109 S.Ct. 1775. The timing of Stegall's termination, the evidence of Stegall's problems with Cartier, and a probe of the station's proffered reasons for terminating Stegall reveal that her protected activity was most likely "a motivating factor" in her termination. See Costa, 299 F.3d at 853-54. At the very least, Stegall has raised a triable issue about Marathon's motivations. Stegall has also made the requisite showing that Marathon's legitimate reasons for terminating her were pretextual, because she has persuaded us that "a discriminatory reason more likely motivated [Marathon]." Burdine, 450 U.S. at 256, 101 S.Ct. 1089. Thus, Stegall is entitled to a trial on this basis as well.
 
 
 48
 Analyzed as either a straightforward "pretext" case or a mixed motives case, the record reveals that it is probable that Stegall's protected activity motivated, at least in part, Marathon's decision to terminate her. Whether or not one accepts one or both of Marathon's explanations for terminating Stegall, one cannot ignore the evidence, albeit circumstantial, that Cartier, who resented Stegall for complaining of gender discrimination, played a significant role in her termination, thus raising a genuine issue of material fact about whether Stegall's termination was in fact retaliatory.
 
 
 49
 Lastly, our decision comes after careful scrutiny of the record and in due regard of the history of discrimination against women in the workplace. Throughout the record, both Marathon and Citadel management repeatedly echoed the all too familiar complaints about assertive, strong women who speak up for themselves: "difficult," "negative attitude," "not a team player," "problematic." The district courts must reject such sexual stereotypes and learn to identify the oft employed rhetoric that could reveal illegitimate motives.
 
 IV CONCLUSION
 
 50
 The record in this case raises a triable issue as to whether Stegall's termination was influenced by improper motives on the part of Marathon. The standard is relatively low:
 
 
 51
 [I]n evaluating whether the defendant's articulated reason is pretextual, the trier of fact must, at a minimum, consider the same evidence that the plaintiff introduced to establish her prima facie case. When that evidence, direct or circumstantial, consists of more than the McDonnell Douglas presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason. The existence of this question of material fact will ordinarily preclude the granting of summary judgment.
 
 
 52
 Sischo-Nownejad, 934 F.2d at 1111 (citations omitted).
 
 
 53
 Moreover, "[w]e require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a `searching inquiry' — one that is most appropriately conducted by a factfinder, upon a full record." Id. We have often stated that, because motivations are difficult to ascertain, such an inquiry should be left to the trier of fact: "[A]n employer's true motive in an employment decision is rarely easy to discern. As we have previously noted, `[w]ithout a searching inquiry into these motives, those [acting for impermissible motives] could easily mask their behavior behind a complex web of post hoc rationalizations....'" Id. (internal quotation marks and citations omitted).
 
 
 54
 Our opinion seeks only to allow Stegall the opportunity to prove Marathon's motivations for terminating her. Because Stegall has marshaled specific and substantial evidence of improper motives on the part of Marathon, we REVERSE the District Court's grant of summary judgment in favor of Marathon, and REMAND for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The five Pasco radio stations that Marathon acquired from Citadel were KORD (a country music station); KEYW (an adult contemporary station); KXRX (a classic rock station); KTHK (a rock station); and KFLD (an AM radio station)
 
 
 [2]
 The only employees who were not initially retained by Marathon at KORD were management-level employees who chose to accept positions with Citadel at other locations in the United States
 
 
 [3]
 Stegall was employed by Marathon for only 24 days
 
 
 [4]
 The format was changed from "contemporary" country to "classic/today's" country. Van Winkle characterized the old format as "way too contemporary," "a teenybopper thing," and "too hip for the audience." The new management broadcast more classic country music that included singers such as George Strait
 
 
 [5]
 Kristin Crume was the other employee terminated on the same day as Stegall. She also previously complained of gender discrimination at KORD
 
 
 [6]
 Although Marathon cites the termination of another employee, Gary Mitchell, that employee was fired nearly a year and a half after Stegall
 
 
 [7]
 Marathon admitted that Stegall had name recognition and thus, visibility, and performed well at "remotes," off site station promotion activities
 
 
 [8]
 Although Marathon objects to Peterson's deposition testimony on the grounds that it is inadmissible hearsay. Such statements fall squarely outside of the definition of hearsay. Federal Rule of Evidence 801 reads, in relevant part, as follows:
 "(d) Statements which are not hearsay. A statement is not hearsay if —
 . . .
 (2) Admission by party-opponent. The statement is offered against a party that is (A) the party's own statement, in either an individual or a representative capacity...."
 FEDERAL RULES OF EVIDENCE 801 (2002).
 
 
 [9]
 Stegall asserted that during her meeting with Drake in which she discussed her complaints of gender discrimination, he was virtually non-responsive
 
 
 
 55
 GOULD, Circuit Judge, dissenting.
 
 
 56
 A summary judgment rejected plaintiff's employment retaliation claim, and we decide if trial is needed to determine whether the termination of an employee who was an on-air personality at a radio station, as part of a format change and overhaul of the radio station, was in reality a pretext for retaliation for her prior complaint about asserted gender-based wage discrimination at the radio station. I conclude that no genuine issue of fact is presented on pretext in the context of the station's undisputably broad changes of on-air personalities after a new owner took control after an acquisition.
 
 
 57
 Marathon Media, L.P. ("Marathon"), defendant-appellee, acquired a group of radio stations and promptly thereafter changed the format of the flagship radio station that it acquired, KORD, from modern country music to more traditional country music. Lynda Stegall, plaintiff-appellant, an on-air personality at KORD before the Marathon acquisition and during a transition period of about six weeks thereafter, was terminated when Marathon changed KORD's format and did a station overhaul that included replacement of every daily on-air personality. Stegall brought suit contending that her employment was terminated in retaliation for gender-based wage discrimination complaints that she made during a meeting with Marathon's new management of KORD shortly before the format change at KORD. Marathon, on the other hand, contends that Stegall was fired because of a broad station change of format and personalities and because of Stegall's poor attitude during Marathon's management of KORD. Because Marathon's articulated reasons for terminating Stegall's employment with KORD are legitimate, nondiscriminatory reasons, we must determine if genuine fact issues were presented whether Marathon's articulated reasons were a pretext for an illegal employment action.
 
 
 58
 * On November 9, 1999, Marathon Media bought five Pasco, Washington radio stations from Citadel Broadcasting, including KORD, a country music station that played recent country music hits. Marathon at first kept most employees at KORD, in order to maintain radio broadcasts at KORD. Lynda Stegall was one of the employees at first retained. She had been employed as an on-air personality at KORD since 1993. After Marathon acquired KORD, Marathon hired a new general manager ("GM"), Eric Van Winkle, to supervise KORD and other acquired stations. Van Winkle hired Paul Drake and Curt Cartier as co-program directors of KORD under Marathon. Drake and Cartier had been program directors at other of the acquired radio stations. Drake and Cartier then controlled KORD's content and presentation.
 
 
 59
 Neither Van Winkle, Drake, nor Cartier supervised Stegall before Marathon's acquisition of KORD. However, Stegall testified that Cartier treated her "very badly" after Stegall returned from a two week leave of absence that she took to protest wage discrimination at KORD, when KORD was under Citadel management. On December 6, 1999, after Marathon's acquisition, Stegall told Drake, now her supervisor, about prior complaints she had made to Citadel complaining that she was paid less than on-air male personalities because of her gender.
 
 
 60
 Nine days later, on December 15, 1999, KORD fired Stegall and another woman announcer, Kristin Crume, because Van Winkle, Drake and Cartier, according to Stegall's testimony, were planning "big changes" for KORD. When Stegall later applied for unemployment benefits, KORD said that "a business decision based on changing the programing and formatting," led to Stegall's termination.
 
 
 61
 After Stegall's termination, Marathon management switched KORD from station-selected music to a computerized music service; brought in Leah Knight, a syndicated host from Seattle; changed the morning show; midday show; afternoon show; nighttime show and overnight show; did on-air promotions about the format changes; stressed a different and more traditional, less contemporary, type of country music broadcast; removed all the daily on-air personalities; and replaced seven announcers on five shifts including every morning show host. The only former daily on-air personality who remained at the station after the broad station change was Ed Dailey, removed from daily duties and given a four-hour Sunday morning "oldies" show. Later, during this litigation, Van Winkle and Drake testified that Stegall was also fired because they did not like parts of Stegall's performance during their brief supervision of KORD and that this influenced their decision not to retain Stegall during the station overhaul.
 
 
 62
 On December 19, 2001, Stegall stipulated to dismissal of her sexual harassment and retaliation claims against Citadel, 16942 and to dismissal of her sexual harassment claims against Marathon. The district court gave Marathon summary judgment rejecting Stegall's Title VII and state law claims of retaliation. The district court was correct and we should affirm.
 
 II
 
 63
 Stegall argues that she was illegally terminated in retaliation for making wage discrimination complaints to Marathon about lower pay she was receiving because of her gender in violation of Title VII and the Washington Law against Discrimination ("WLAD"). Because Washington courts look to federal law when analyzing retaliation claims, we analyze Stegall's Washington state law claims and federal claims together. See Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir.2002); Graves v. Dep't of Game, 76 Wash.App. 705, 887 P.2d 424, 428 (1994).
 
 
 64
 Under § 704 of Title VII of the Civil Rights Act of 1964, it is unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); see also Trent v. Valley Electric Association, Inc., 41 F.3d 524, 526 (9th Cir.1994) ("Courts have interpreted `unlawful employment practices' to include a panoply of actions involving discrimination and sexual harassment."). Because the district court granted summary judgment to Marathon we review Stegall's claims de novo. Oliver v. Keller, 289 F.3d 623, 626 (9th Cir.2002). In doing so, we view all evidence in the light most favorable to Stegall and determine whether there are any genuine issues of material fact precluding summary judgment. Id.
 
 
 65
 To prevail on a retaliation claim brought under Title VII, Stegall must first establish a prima facie case of illegal retaliation by showing that (1) she was engaging in a protected activity; (2) she suffered an adverse employment decision; and; (3) a causal link exists between her activity and the employment decision. Trent, 41 F.3d at 526; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In an appropriate case, "[t]he causal link may be established by an inference derived from circumstantial evidence." Jordan v. Clark, 847 F.2d 1368, 1376 (9th Cir.1988). If Stegall establishes a prima facie case of illegal retaliation, the burden of production shifts to Marathon to articulate a legitimate nondiscriminatory reason for terminating Stegall's employment. Wrighten v. Metro. Hosps. Inc., 726 F.2d 1346, 1354(9th Cir. 1984). If Marathon gives such a reason, the burden of production shifts to Stegall to prove that Marathon's articulated reason is a pretext for illegal retaliation, with pretext shown "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980) (citation omitted). If Stegall satisfies her burden of producing evidence that Marathon's reasons are pretextual, summary judgment is inappropriate and a jury is entitled to infer that the motive for Marathon's employment action was retaliatory. Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
 
 
 66
 * Because Marathon does not question that Stegall has established a prima facie case of retaliation, I begin analysis by looking at Marathon's actions and testimony to determine whether Marathon has satisfied its burden, of production, to articulate a legitimate, nondiscriminatory reason for terminating Stegall's employment. Despite Stegall's argument that Marathon's reasons are not legitimate, the reasons extended by Marathon, if asserted in good faith and not as a pretext, are legitimate business interests sufficient to support the termination of an employee.
 
 
 67
 Marathon offers two reasons for terminating Stegall's employment. First, Marathon states that it terminated Stegall's employment because of its decision to overhaul the programming of KORD from a modern country station that played the latest country hits to a more traditional country music radio station that played older country songs. Second, Marathon states that it terminated Stegall because of a perception among Marathon management that Stegall did not place a priority on maintaining strong working relationships and thus displayed a poor attitude toward her job and her co-workers. The reasons articulated by Marathon satisfy Marathon's burden of production to articulate legitimate nondiscriminatory reasons for terminating Stegall's employment. See Aragon v. Republic Silver State Disposal, 292 F.3d 654, 661 (9th Cir.2002).
 
 B
 
 68
 Because Marathon has articulated legitimate, nondiscriminatory reasons for terminating Stegall, the burden shifts back to Stegall to prove that Marathon's articulated reasons are a pretext for illegal retaliation by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs, 450 U.S. at 256, 101 S.Ct. 1089 (1980).
 
 
 69
 First, Stegall argues that we should infer pretext because the timing of Marathon's decision to terminate her occurred shortly after she made a wage complaint to Marathon management. Although Stegall previously made gender-based wage discrimination complaints to Citadel management at KORD, she renewed her gender-based wage discrimination complaints to Drake, her immediate supervisor under Marathon management of KORD, on December 6, 1999, and was fired 9 days later on December 15, 1999. Stegall argues that the timing of Marathon's decision to fire her after her wage discrimination complaint to Marathon management shows pretext because her performance at KORD was good and because one of the persons responsible for deciding to fire her, Curt Cartier, was upset that Stegall took a two week leave of absence to protest wage discrimination while KORD was under Citadel ownership.
 
 
 70
 As for her first point, timing of a termination can be significant, and with other evidence of pretext in an appropriate case may be persuasive to show pretext. In Little v. Windermere Relocation, Inc., we stated that evidence of pretext was shown from the timing of the employer's decision to fire the employee because the employee was fired "within minutes" of her complaint, because the employee had a documented record of superior performance, and because the employee's supervisor was suspiciously uninvolved in the employer's decision to terminate the plaintiff. 301 F.3d 958 (9th Cir.2002). Stegall's case against Marathon as to significance of timing to show pretext is nothing like the case presented by the terminated employee in Little. Unlike the employee in Little, Stegall has presented no substantial evidence that the timing of her termination provides evidence of Marathon's pretext. Marathon terminated Stegall about six weeks after it purchased KORD from Citadel, whereas in Little the plaintiff's termination occurred minutes after the employee's complaint about a rape by a customer. Further, while the employee's termination in Little stood alone, within weeks of Stegall's termination, Marathon replaced every daily on-air personality at KORD with new talent in an effort to increase KORD's ratings. As Drake testified:
 
 
 71
 I wanted to make changes. And I think Eric [Van Winkle] described wholesale changes. KORD was hurting financially. It was not billing what it should. We wanted to make a splash.... We changed the morning show. We changed the midday. We changed the afternoon. We changed the nighttime show. We changed the overnight show. We changed the music. We made complete changes around the clock.
 
 
 72
 Further, the supervisor of the employee in Little was not consulted about the termination, whereas here Stegall's direct supervisor, Drake, was involved in the decision to terminate Stegall's employment. And Stegall has not presented any evidence that Cartier knew of any of Stegall's prior complaints to Citadel or that he knew that Stegall was making complaints about gender-based wage discrimination.[1]
 
 
 73
 That Stegall's employment was terminated nine days after making a gender-based wage discrimination complaint, in the context of undisputed facts presented including the wholesale changes at the station, does not raise any genuine issue of fact on pretext by the employer. Although Marathon's decision to fire Stegall was not remote to her wage discrimination complaint to Marathon management, there was insufficient evidence of pretext based on the timing of Marathon's decision because the timing of Marathon's decision to fire Stegall is incontestably supported by its articulated reason of instituting a broad overhaul of KORD.
 
 
 74
 Second, Stegall argues that Marathon's two reasons for terminating her — the need to conduct a broad format change and her poor attitude — are shifting and inconsistent reasons which provide evidence of pretext. Stegall also argues that Marathon's second articulated reason for laying her off, her poor work attitude, supports a finding of pretext since Marathon did not articulate this reason until the commencement of litigation. It is correct that "fundamentally different justifications for an employer's action ... give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir.1994). But different justifications for an adverse employment action will not defeat summary judgment if those reasons are "not incompatible." See Nidds v. Schindler Elevator Corp., 113 F.3d 912, 918 (9th Cir.1996). See also Aragon, 292 F.3d at 661 ("We do not infer pretext from the simple fact that [an employer] has two different, although consistent, reasons for laying off [an employee.]").
 
 
 75
 I conclude that Marathon's reasons for terminating Stegall are not inconsistent and do not support a showing of pretext. That Stegall's work attitude was perceived by Marathon to be poor is not inconsistent with Marathon's articulated reason that it fired Stegall to effect a broader station overhaul. The articulated reason of Stegall's poor attitude supports Marathon's decision not to retain Stegall during the overhaul that replaced every daily on-air personality at KORD. Also, as we have previously held, that an employer has given an explanation not previously stated until after the commencement of litigation does not by itself create sufficient evidence of pretext. See Lindahl v. Air France, 930 F.2d 1434, 1438(9th Cir.1991) ("Simply because an explanation comes after the beginning of litigation does not make it inherently incredible."). See also Coleman v. Quaker Oats Co., 232 F.3d 1271, 1286 (9th Cir.2000) (holding that employer's reasons for termination which "mainly detail[ed] the earlier one [it gave]," was not sufficient evidence of pretext).
 
 
 76
 Third, Stegall argues that one of the underlying reasons for Marathon's termination of Stegall — the broad station overhaul of KORD — is not worthy of credence. Stegall argues in support of this position that a change in "the programming and format" of a radio station is common in radio and that a change in format does not usually require a change of on-air personalities. Stegall also asserts that the "overhaul" claimed by Marathon involved nothing more than routine changes. But even if some format changes of radio stations are done without personnel changes, that cannot be said to render illegitimate a radio station's new management's business objective if it prefers to have fresh faces and talent to advance its chosen format.
 
 
 77
 Marathon's reason that it was overhauling KORD is supported by its actions during and after Stegall's termination: Although some on-air personalities were transferred to other stations, some resigned, and others were terminated, Marathon did replace every daily on-air personality, not merely Stegall, soon after Marathon bought KORD. KORD under Marathon moved from having a station-selected music format to a computer-automated music selection, a system that reduced KORD's reliance on its employee announcers to select music. KORD changed its station format from modern country to older country music. These changes of personnel, operation, and program format at KORD strongly support Marathon's articulated reason that it conducted a broad station overhaul of KORD and on the undisputed evidence foreclose Stegall's assertion of pretext.
 
 III
 
 78
 Stegall submitted insufficient evidence that Marathon's articulated legitimate, nondiscriminatory reasons for terminating her were a pretext for illegal retaliation to avoid a summary judgment based on Marathon's legitimate reasons for termination. I would affirm the district court's grant of summary judgment to Marathon Media on Stegall's illegal retaliation claims under Title VII and Washington Law. Accordingly, I must respectfully dissent.[2]
 
 
 
 Notes:
 
 
 [1]
 The majority also relies onBell v. Clackamas County, 341 F.3d 858 (9th Cir.2003), holding in that case that temporal proximity between protected activity and adverse employment action might be sufficient circumstantial evidence of retaliation. Bell adds nothing to analysis based on Little, for in Bell, as in Little, an adverse employment action, in the case of Bell it was negative performance reviews, "immediately followed plaintiff's complaint" in the majority's words. The majority also cites Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987), which the majority contends found "highly probative" timing between employee complaint and adverse action that "far exceeded" the 9 day interval between Stegall's complaint and her termination. Although Yartzoff held that the negative performance ratings in that case coming three weeks after protected activity of Yartzoff's complaints was sufficient to establish a prima facie case on causation, each case turns on its facts and the majority here ignores the undisputed evidence proving that Stegall's termination was part of a broader set of terminations incidental to a new ownership's desire to change programming and on-air personalities. That all on-air announcers were terminated from their full-time positions precludes the negative inference that the majority draws under a rational interpretation of the evidence.
 
 
 [2]
 Apart from my disagreement with the majority's pretext assessment, I also regret to say that the majority's analysis distorts and misunderstands our law. First, though circumstantial evidence was approved by the Supreme Court inDesert Palace, Inc. v. Costa, ___ U.S. ___, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), as a way to show mixed motive, rejecting the prior view of many circuits that direct evidence was required for a mixed motive jury instruction, that has nothing to do with this case which deals with the traditional and long-established assessment of the three-part test required by the Supreme Court's McDonnell Douglas precedent to assess whether a summary judgment may be given in a Title VII case. It has always been the law, in our circuit and elsewhere, that circumstantial evidence is admissible and can be considered on the issues of whether a prima facie case has been made, whether the employer has shown legitimate reasons for a termination, and whether the reasons given are pretextual. Nothing is new in that regard. I fully accept that Stegall can argue circumstantial evidence. It is simply not sufficient in the context of the station's broad change of program and personalities after an acquisition and the entry of new management.
 Second, the majority appears to be "tutoring" Stegall's counsel to attempt to present this case as a mixed motive case, when the majority asserts of mixed motive cases that "Stegall's case is arguably one." This case however was dismissed on summary judgment. No issue was presented about any request for a mixed motive jury instruction, which was premature. The majority's dicta about mixed motive cases properly has nothing to do with analysis of whether the record before the court when it granted summary judgment showed a genuine issue of fact on pretext.
 Third, the majority makes much of Stegall's problems with Cartier which occurred long before the change of management. No genuine dispute on pretext of the termination as part of broad station change is shown by Cartier's dissatisfaction expressed when Stegall previously walked off the job.