Carmichell BELL, Plaintiff–Appellee,

v.

CLACKAMAS COUNTY, a political subdivision of the State of Oregon; Clackamas County Sheriff; Jeff Davis, Deputy; Roxanne Cadotte, Deputy; Alan Alderman, Sergeant; Juli Fitzwater, Deputy; Jeff Huva, Deputy; Jeff Grahn, Deputy; Michael Machado, Lieutenant; Pat Detloff, Deputy, Defendants–Appellants.

Carmichell Bell, Plaintiff–Appellant,

v.

Clackamas County, a political subdivision of the State of Oregon; Clackamas County Sheriff; Jeff Davis, Deputy; Roxanne Cadotte, Deputy; Alan Alderman, Sergeant; Juli Fitzwater, Deputy; Jeff Huva, Deputy; Jeff Grahn, Deputy; Michael Machado, Lieutenant; Pat Detloff, Deputy, Defendants–Appellees.

Carmichell Bell, Plaintiff–Appellee,

v.

Clackamas County, a political subdivision of the State of Oregon; Jeff Davis, Deputy; Roxanne Cadotte, Deputy; Alan Alderman, Sergeant;

Juli Fitzwater, Deputy; Jeff Huva, Deputy; Jeff Grahn, Deputy; Michael Machado, Lieutenant, Defendants–Appellants,

and

Pat Detloff, Deputy, Defendant.

Carmichell Bell, Plaintiff–Appellant,

v.

Clackamas County, a political subdivision of the State of Oregon; Clackamas County Sheriff; Jeff Davis, Deputy; Roxanne Cadotte, Deputy; Alan Alderman, Sergeant; Juli Fitzwater, Deputy; Jeff Huva, Deputy; Jeff Grahn, Deputy; Michael Machado, Lieutenant; Pat Detloff, Deputy, Defendants–Appellees.

Nos. 01–35508, 01–35854, 01–35545, 01–35790.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 2003.

Filed Aug. 20, 2003.

Amended Aug. 29, 2003.

Edward S. McGlone, III, Clackamas County Counsel, Oregon City, OR, for the Defendants-appellants/appellees.

Helen T. Dziuba, Lake Oswego, OR, for the Plaintiff-appellee/appellant.

Before GOODWIN, HUG, and BERZON, Circuit Judges.

## ORDER AND AMENDED OPINION

### ORDER

The opinion filed August 20, 2003, slip op. 11661, is amended as follows:

Delete entire section IV, on page 22, slip op. 11679–11680, and replace with the new section IV:

### IV.

Bell also cross-appeals the trial court's reduction of his attorneys' hourly rates from $200 to $175. He argues that the trial court erred in relying on an unpublished decision, *Davis v. Wyatt*, CV 97–1388–ST (D.Or. Oct. 20, 1998), to award attorney fees here for work performed in 2000 and 2001 at the same rate awarded in that 1998 decision. We agree.

A court awarding attorney fees must look to the prevailing market rates in the relevant community. *See Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). We have held that the court has discretion to apply the rates in effect at the time the work was performed, *see Barjon v. Dalton*, 132 F.3d 496, 502(9th Cir.1997); *Schwarz v. Secretary of HHS*, 73 F.3d 895, 908–09 (9th Cir.1995). The court may also award rates at an attorney's current rate where appropriate to compensate for the lengthy delay in receiving payment:

Our cases have repeatedly stressed that attorney's fees awarded under this statute are to be based on market rates for the services rendered. Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private

billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute.

*Missouri v. Jenkins by Agyei,* 491 U.S. 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (internal citations omitted).

We hold, however, that it was an abuse of discretion in this case to apply market rates in effect more than two years *before* the work was performed. Accordingly, we reverse and remand for the trial court to re-evaluate Bell's request for attorney fees without relying solely on the prevailing rates established in 1998.

We also hold that the trial court did not err in declining to apply a multiplier. Bell failed to meet his burden of proving that an upward adjustment was appropriate. *See Blum,* 465 U.S. at 898–99, 104 S.Ct. 1541.

### OPINION

GOODWIN, Circuit Judge:

Carmichell Bell, the first African–American deputy ever hired by the Clackamas County Sheriff's Office (CCSO), was awarded substantial damages by a jury on his retaliation and discrimination claims under Title VII, and 42 U.S.C. §§ 1981 and 1983. The defendants appeal the judgment; Bell cross-appeals the trial court's reduction of punitive damages and attorney fees.[1] We affirm in part, and reverse and remand in part.

### I.

Bell worked as a Lake Oswego police officer from February 1, 1996 until December 28, 1997, when he accepted a position at CCSO as a probationary recruit deputy. At that time, he had successfully complet-ed the Oregon Basic Police Course as well as Lake Oswego's Field Training and Evaluation Program (FTEP), which is similar to CCSO's FTEP. Bell had also obtained significant law enforcement training in the Army, where he served in the Military Police. Bell received high scores in Lake Oswego's FTEP for acceptance of feedback, orientation, officer safety, report writing, and radio use. Bell had completed his probationary period with the Lake Oswego Police Department (LOPD) and had been placed on regular status when he resigned to work at CCSO. Lake Oswego's Chief of Police told the jury that Bell would have progressed rapidly at LOPD because of his demonstrated high level of competency.

CCSO increased Bell's entry salary because of his "knowledge, experience and previous compensation." CCSO then placed Bell in its FTEP, which, like Lake Oswego's FTEP, consists of five phases. A recruit's performance is documented for each shift on a Daily Observation Report (DOR), which asks Field Training Officers (FTO) to grade the recruit in 31 performance areas. Scoring is on a one to seven scale, with four being the minimal acceptable score. Recruits are allowed to make mistakes and can successfully complete FTEP with a number of scores below four; scores are monitored only for patterns of substandard performance and are not averaged to determine success. A "not responding to training score" (NRT) is awarded when a recruit, after having received sufficient training, continues to perform unacceptably in a certain area.

Bell completed Phase I and advanced to Phase II, where his FTO was Deputy Layng. Layng recommended advancement and reported that Bell has great "people skills" and communicates well.

---

1. The several appeals have been consolidated.

Bell then advanced to Phase III, where Deputy Jeff Davis, a defendant in this action, was his FTO from March 31, 1998, to May 1, 1998. In addition to making stereotypical comments about the local Russian immigrants, Davis told Bell to look for Asians in Asian cars and pull them over without probable cause because Asians steal Asian cars; he also told Bell to pull over Latinos because they usually do not have insurance and stopping them can result in a "tow or a good ticket." Bell also testified: "I would try to pull over vehicles for violations, equipment violations, road violations. On several occasions [Davis] told me, 'Carl, you need to quit looking at what the cars are doing and look at the people in the vehicles.'"

Bell told the jury that when Davis saw an interracial couple consisting of a black male and a white female, Davis would ask: "Why do the brothers always get the fat, ugly girls?" Davis further asked Bell why "black men like women with big butts," and whether it was "true that black men have bigger dicks." Davis also bragged about how some deputies have power to get a trainee "washed out of the program." Bell explained that he did not complain about Davis' conduct during Phase III because he wanted to move on in the program and thought he would be finished dealing with inappropriate racial comments after Davis was no longer his FTO.

Davis' DORs for Bell reflected satisfactory to superior scores for acceptance of feedback, report writing, officer safety, investigation, decision-making, police-stops, and orientation. Out of a total of 419 scores, Davis gave Bell only fifteen unacceptable scores. Davis recommended advancement at the close of Phase III, and indicated in his final report that Bell's "significant strengths" were: "Knowledge of criminal, traffic laws, most phases of report writing, investigative skills, ability to get along well with others, taking pride in how he looks at work, positive attitude towards his work." Davis' final report indicated that Bell had no significant weaknesses.

Bell's third FTO was Deputy Roxanne Cadotte, a defendant in this action who trained Bell during Phase IV from May 8, 1998, to May 27, 1998. Sergeant Alan Alderman, also a defendant here, was Bell's Field Training Sergeant (FTS) at this time. On May 10, Cadotte and Bell responded to a hit-and-run accident. Bell contacted a victim's daughter by phone and learned the identity of a potential suspect. Cadotte criticized Bell in that day's DOR for speaking unprofessionally to the victim's daughter. Bell testified that Cadotte told him: "[I]t was very unprofessional ..., the way I was talking to the lady on the phone, and she didn't like it when I was talking like a black person."

Bell was originally assigned to Deputy Ken Boell as his FTO for Phase IV, but had been reassigned to Cadotte for unknown reasons. While people were milling around before a shift briefing sometime between May 8 and May 11, Bell watched Sergeant Alderman tease Boell, asking, "Why did you get Bell? Because you were in the Klan? Because you were in the Aryan Nation." Alderman also talked "about Deputy Boell having SS tattoos on his arm," and referred to Boell as "Aryan Ken." Bell assumed that none of Alderman's statements were true, having heard only good things about Boell from Layng, but felt degraded and powerless.

Alderman instigated an informal meeting with Bell and Cadotte on May 18 to inquire about Bell's progress in FTEP. Bell discussed his concerns regarding Alderman's Klan and Aryan Nation comments, and Cadotte's "talking like a black person" comment. Cadotte abruptly left the room at that point, stating "she

couldn't believe that [Bell] was not over that yet." After Alderman assured Bell that the "stripes were off," indicating that the conversation was a private rather than an official one, Bell discussed Davis' conduct. Bell testified that Alderman responded as follows: "[T]here are some things [you are] going to have to put up with. He said he knows and other deputies know what Deputy Davis does, and they avoid him and he avoids him.... Shut your mouth, you sit there, and get through it." With respect to Bell's concerns regarding Cadotte's criticism for speaking like a black person and low scores for communication, Alderman told Bell he "was focusing too much on the numbers. The numbers didn't matter. [Bell] could get through FTEP with straight 1s, it didn't matter."

On the morning of May 22, CCSO's training coordinator, Juli Fitzwater, another named defendant, held a meeting to discuss Bell. In attendance were Layng, Davis, Cadotte, Alderman, and Lieutenant Mike Machado. Machado, also a defendant here, was not in Bell's chain of command, but attended the meeting at Fitzwater's request. Machado shared an office with Fitzwater and was her fiancé. Bell had no notice of this meeting, and no notes, written plan, or report were generated at the meeting. Bell learned of the meeting when he was looking for Cadotte to start their shift and opened the door to the room where the meeting was being held. Realizing that they were having a meeting, Bell went to his patrol car to wait for Cadotte. As he waited, Bell saw Davis walk angrily out of the building and glare at him.

After the meeting, Cadotte and Bell worked their shift that day. At the end of the day, Cadotte gave Bell his first NRT score for orientation; she also gave him an unacceptable score for acceptance of feed-back. Before the May 22 meeting, Bell had received fifteen superior scores for acceptance of feedback, and only one unacceptable score in that category. Cadotte then proceeded to give Bell NRT scores for the next two days of training. Out of a total of 217 scores, Cadotte gave Bell 73 unacceptable scores.

Fitzwater met with Bell on May 26 to discuss his concerns regarding Cadotte, and Bell requested he be assigned a different FTO. Cadotte recommended that Bell be "unplugged" from regular training and given remedial training instead. Cadotte was then removed as Bell's FTO, and Bell was assigned directly to Sergeant Alderman in "limbo" status from May 29 to June 1. Bell was then placed back into Phase IV, and was assigned Deputy Jeff Huva, another named defendant, as his FTO. Huva spoke to all of Bell's prior FTOs before training him, and trained him for only three days: June 2, 9, and 10, 1998. On the first day of training, Huva told Bell that "when he was in the Navy he trained dolphins. And if he could train Dolphins, he could train [Bell]." Huva gave Bell 1 NRT score and 9 unacceptable scores on that day; 2 NRT scores and 18 unacceptable scores the next day; and 3 NRT scores and 14 unacceptable scores on his third and final day of training Bell. On the second day, Huva had prohibited Bell from using two main roads in responding to low priority calls and then gave Bell an NRT score for orientation, for failing to respond to a call in a reasonable time. Nothing in the FTEP guidelines provided for limiting a trainee's use of roads in responding to calls. Out of a total of 86 scores, Huva gave Bell 42 unacceptable scores.

Huva, Cadotte, Fitzwater, Davis, Alderman, and Machado attended a meeting with Captain Grolbert and Sergeant Waggoner on June 9, 1998 to discuss whether

to terminate Bell. Fitzwater's notes from this meeting were shredded. Huva, Cadotte, Fitzwater, Davis, Alderman, Waggoner, and Machado recommended termination, but Grolbert decided to continue Bell in training for one more week. Huva told Grolbert in that meeting that if Bell was terminated, "be prepared, he may play the race card."

On June 10, Bell and Huva went on patrol and responded to a dispute at Burlington Coat Factory. The defendants assert that Bell caused officer safety issues, which justified his termination, by exaggerating the seriousness of a domestic dispute. Bell counters that he merely relayed what he heard by listening in on a phone conversation between a woman at Burlington Coat Factory and her husband, who was at home, and points out that Davis had confirmed that Bell's recitation of the incident was "legit."

Alderman wrote a memo on June 11 to Fitzwater recommending that Bell be terminated because all training and attempts to correct unacceptable police work had been exhausted. On June 12, Fitzwater told Bell that "there were too many problems in training" and placed him on administrative leave pending termination. On June 17, Bell filed a discrimination complaint with CCSO; he also filed an internal affairs complaint against Davis about a knife he took from a suspect's residence. On June 29, the county hired an outside consultant, Loper, Coe and Associates, to investigate the discrimination complaint and generate a report.

For reasons not explained by the record, Captain Grolbert placed Bell back on duty on July 9 for a 30 day trial period, with the caveat that Bell could be terminated after only eight days for substandard performance, on the condition that Bell sign DORs for previous training days with Huva. Bell's final FTO was Deputy Jeff Grahn, a defendant in this case; Grahn spoke to Fitzwater and Machado about Bell before training Bell. Grahn trained him from July 11 to August 1. Sergeant Veracruz was assigned as the FTS at this time. Veracruz encouraged Bell to call him for assistance but Grahn prohibited Bell from calling Veracruz or any other sergeant for help. Bell met with Veracruz on July 19, before Veracruz left for vacation the next day; Veracruz' report as of that date indicates that Bell was doing fine and that Veracruz looked forward to his success.

After approximately eight days of training, Grahn recommended to Fitzwater that another meeting be held to determine whether Bell should be terminated. On July 20, Grahn called Veracruz while he was on vacation to report that the decision had been made to suspend Bell from FTEP. At a July 21 meeting, Grolbert again continued Bell's training, telling Bell that he wanted him to succeed but that he could not receive any more NRT scores. Grahn heard this admonition. Grolbert then left for vacation.

Grahn continued training Bell until August 1, when he reported to Fitzwater that he had given Bell two NRT scores. Grahn's DORs criticized Bell for, *inter alia*, poor report writing and decision-making. On August 2 Fitzwater and Machado encouraged Bell to resign. When Bell defended himself on the basis that he was treated by different standards than the other recruits, Machado responded by telling Bell not to be like "those people" and not to be a "victim." Bell was then again placed on administrative leave pending termination.

Chief Deputy Pat Detloff,[2] a defendant in this case, informed Bell by a memo

---

2. Detloff was Chief Deputy at all relevant times; he is now the elected Sheriff of Clacka-mas County.

dated August 11 that he would remain on administrative leave until the training process was reviewed. Over a period of several months (June 1998 to September 1998), Loper, Coe and Associates interviewed all the individual defendants except Detloff, as well as several other CCSO officers. The Loper report was sent to CCSO on September 10. On the basis of the Loper report, Clackamas County concluded that there was no evidence of discrimination. Detloff formally terminated Bell on December 28. Detloff told the jury that he never read the Loper report, but instead relied only on its conclusion that no discrimination had occurred.

All the other recruit deputies in Bell's class passed FTEP and were placed on regular status. After Bell's termination, CCSO continued to hire deputy sheriffs, but did not hire any African–Americans.

Bell then sued under, *inter alia*, Title VII, and §§ 1981 and 1983. A jury returned a verdict in his favor, awarding him $52,446.42 in economic damages and $750,000 in noneconomic damages, and punitive damages in the amount of $250,000 against Detloff and $52,446.42 against each of the other defendants. The defendants then filed a renewed motion for judgment as a matter of law, or in the alternative, a motion for new trial and a motion for remittitur. The trial court granted the motion in part by eliminating the judgment against Detloff, and reducing, on due process grounds, the punitive damages award against each of the remaining defendants to $10,000. Bell next petitioned the trial court for attorney fees and costs under § 1988. The trial court reduced Bell's attorneys' hourly rates from $200 to $175 per hour, and awarded Bell $216,055 in attorney fees.

The defendants appeal the denial of their motions for judgment as a matter of law. Bell cross-appeals the elimination of the judgment against Detloff and the reduction of punitive damages and attorney fees.

## II.

We review de novo the trial court's denial of the defendants' motions for judgment as a matter of law. *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir.2002), *aff'd,* —— U.S. ——, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). We can overturn the jury's verdict only if there is no legally sufficient basis for a reasonable jury to find in favor of Bell. *See* Fed. R.Civ.P. 50(a); *see also Costa,* 299 F.3d at 859. We may not make credibility determinations and must draw all inferences in Bell's favor, disregarding all evidence favorable to the defendants that the jury was not required to believe. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### A. *The Retaliation Claim*

The defendants assert that Bell failed to present enough evidence for the jury to draw a reasonable inference that the defendants retaliated against him for having engaged in protected activity. This assignment of error is wholly without merit.

Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases. *See Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065(9th Cir.2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of

protected activity."); *see also Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1287 n. 10 (9th Cir.2001) (concluding that plaintiff's complaints, which closely preceded reduction in her performance review scores, supported a reasonable inference that defendant acted with a retaliatory motive); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (sufficient evidence of causation existed where adverse actions occurred less than three months after complaint was filed, two weeks after charge first investigated, and less than two months after investigation ended); *cf. Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that timing alone did not support claim of retaliation because almost two years had passed from when the defendant must have known about plaintiff's protected activity before imposing alleged adverse employment action).

Here, the temporal proximity between Bell's complaints and the alleged adverse employment actions, together with evidence of Alderman's and Cadotte's contemporaneous displeasure with Bell's complaints of May 18 regarding racial comments and racial profiling, provides strong circumstantial evidence of retaliation. *See Winarto*, 274 F.3d at 1286(reasoning that the defendant's "exasperation, lack of sympathy, and even animosity toward [the plaintiff]" provided additional support for the jury's verdict).

The jury could have reasonably inferred that Alderman and Cadotte shared Bell's complaints with Fitzwater, Machado, and Davis at the May 22 meeting. Bell saw Davis glare angrily at him as Davis left the building following that meeting. *See id.* (explaining that plaintiff's perception that a defendant looked at her rudely and angrily constituted circumstantial evidence of an improper motive and that "to ignore [plaintiff's] testimony [as to her impressions] is to intrude on the province of the jury"). Further, the meeting was not held pursuant to FTEP guidelines, and no notes, report, or written plan were generated from this meeting, suggesting an intent to conceal the purpose of the meeting.

While Bell did receive some substandard scores before May 18, FTEP contemplates that a recruit will receive such scores, and Bell was advancing through the program on a steady course with no significant weaknesses or NRT scores. Moreover, the jury heard that Bell had successfully completed Lake Oswego's FTEP, and that he had received consistent superior scores in several categories in CCSO's FTEP, including for acceptance of feedback *until* his shift with Cadotte immediately following the May 22 meeting. *See id.* (criticism of the plaintiff for not being involved in team efforts was evidence of retaliatory motive where the defendant had called her an "excellent team player" before she had engaged in protected activity).

Against this backdrop, the jury was entitled to disbelieve the defendants' assertion that the purpose of the May 22, 1998, meeting was to discuss Bell's pre-May 18 substandard performance and that Bell was ultimately fired because of substandard performance. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir.2000) ("[W]e have held that evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant.").

In addition, Bell's subsequent FTOs, Huva and Grahn (who the jury could have reasonably believed had spoken to one or more of the defendants in attendance at the May 22 meeting about Bell's complaints of racism), were both able to conclude with stunning speed that Bell could not respond to training. This odd coinci-

dence was not lost upon the jury in drawing an inference that Huva and Grahn had acted with improper motivation in recommending Bell's termination. *Cf. Villiarimo*, 281 F.3d at 1063 (no inference of discrimination where "[the plaintiff] presented no evidence that [defendant] did not honestly believe its proffered reasons").

In sum, Bell offered specific and substantial circumstantial evidence in support of the jury's determination that he was terminated because of his complaints regarding racial profiling and racial comments, and not because he was unable to respond to CCSO's training. Our careful review of the record also leads us to uphold the jury's verdict imposing individual liability against all defendants, except Detloff, under 42 U.S.C. §§ 1981 and 1983.

■ Detloff's individual liability is less clear. The trial court set aside the part of the jury's verdict imposing liability against Detloff, reasoning that "the evidence does not support a finding that he was responsible for any discriminatory or retaliatory conduct."[3] Bell cross-appeals this decision. We agree with the trial court. Apart from bureaucratic negligence, the record contains no direct evidence and little circumstantial evidence to establish any improper motive or conduct on his part.

### B. *The Discrimination Claim*

Once at the trial stage on his discrimination claim, Bell was required to show by a preponderance of evidence that he was fired *because* he was African–American. *See Costa*, 299 F.3d at 856. The difficulty with the discrimination claim is that Bell experienced success in CCSO's FTEP until he complained about racial profiling and racial comments. We need not, however, reach the merits of the discrimination claim because a reversal on that claim would not affect the validity of the judgment entered against the defendants. Bell presented abundant evidence on the retaliation claim, and damages for the two claims would be redundant.

### III.

■ We reverse the trial court's reduction of punitive damages against the individual defendants, other than Detloff, and remand for reconsideration whether the jury's award against each of those defendants comports with due process in light of *State Farm Mut. Auto. Ins. Co. v. Campbell*, — U.S. —, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), and *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir.2003).

On remand, the trial court should evaluate the degree of reprehensibility of each of the defendant's misconduct individually, as opposed to *en grosse*. *See BMW v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("[E]xemplary damages imposed on a defendant should reflect 'the enormity of his offense.' "); *In re Exxon Valdez*, 270 F.3d 1215, 1242 (9th Cir. 2001) (considering relative reprehensibility of company defendant as compared to that

---

**3.** The trial court's order granting Detloff's motion for judgment as a matter of law was couched in terms of punitive damages. Because, however, the court found that the record did not support a finding that Detloff "was responsible for any discriminatory or retaliatory conduct," we read the order as granting Detloff's motion for judgment as a matter of law against his individual liability as well as against punitive damages. Detloff's individual liability cannot be premised on respondeat superior. *See, e.g., Jones v. Williams*, 297 F.3d 930, 934 (9th Cir.2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983.").

of individual defendant). We also note that retaliation in this case was proven primarily by circumstantial evidence. The proof here was abundant and the circumstantial nature of it does not warrant a reduction of punitive damages. *See Costa,* 123 S.Ct. at 2154("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.").

■ Finally, if the trial court deems it appropriate to reduce the punitive damages awards as so "grossly excessive" in violation of due process on the basis of the individual defendants' ability to pay, it may do so only to the extent the record substantiates their wealth. *Cf. Swinton,* 270 F.3d at 819(concluding that the ratio of the damages award was not excessive in view of defendant's financial picture). Similarly, to the degree that the defendants seek reduction of punitive damages because of their inability to pay, any indemnification by the County for the payment of such damages[4] may be taken into account. *See Lawson v. Trowbridge,* 153 F.3d 368, 379(7th Cir.1998) (explaining that the rationale for applying the general rule of excluding evidence of indemnification dissolves "once the defendants made their financial weaknesses the centerpiece of their testimony in the damages phase of the trial"); *cf. Larez v. Holcomb,* 16 F.3d 1513, 1521 (9th Cir.1994) ("Informing the jury of indemnification ... would provide a windfall to plaintiffs at taxpayers' expense.").

## IV.

■ Bell also cross-appeals the trial court's reduction of his attorneys' hourly

rates from $200 to $175. He argues that the trial court erred in relying on an unpublished decision, *Davis v. Wyatt,* CV 97–1388–ST (D.Or. Oct. 20, 1998), to award attorney fees here for work performed in 2000 and 2001 at the same rate awarded in that 1998 decision. We agree.

■ A court awarding attorney fees must look to the prevailing market rates in the relevant community. *See Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). We have held that the court has discretion to apply the rates in effect at the time the work was performed. *See Barjon v. Dalton,* 132 F.3d 496, 502(9th Cir.1997); *Schwarz v. Secretary of HHS,* 73 F.3d 895, 908–09 (9th Cir.1995). The court may also award rates at an attorney's current rate where appropriate to compensate for the lengthy delay in receiving payment:

> Our cases have repeatedly stressed that attorney's fees awarded under this statute are to be based on market rates for the services rendered. Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute.

---

**4.** Although municipal defendants are immune from liability for punitive damages under § 1983, *see City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), municipalities may pay punitive damages in some circumstances. *Cf.*

Cal. Gov't Code § 825(b)(authorizing a public entity to pay a punitive damages award against an employee if the employee acted in good faith and within the scope of his or her public employment).

*Missouri v. Jenkins by Agyei,* 491 U.S. 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (internal citations omitted).

We hold, however, that it was an abuse of discretion in this case to apply market rates in effect more than two years *before* the work was performed. Accordingly, we reverse and remand for the trial court to re-evaluate Bell's request for attorney fees without relying solely on the prevailing rates established in 1998.

We also hold that the trial court did not err in declining to apply a multiplier. Bell failed to meet his burden of proving that an upward adjustment was appropriate. *See Blum,* 465 U.S. at 898–99, 104 S.Ct. 1541.

## V.

We affirm in part, and reverse and remand in part. Costs on appeal are to be awarded only to Bell.

